UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO: 12-10090-01-PBS |
| | : | |
| HARRY P. LEVY | : | |

# REDACTED VERSION OF
## DEFENDANT'S SENTENCING MEMORANDUM
### And
## MOTION FOR DOWNWARD VARIANCE

**I.   Introduction**

Defendant Harry Levy, through counsel, respectfully submits this Redacted Version of his Sentencing Memorandum and Motion for a variance from the advisory guideline in connection with his sentencing on September 6, 2012.  Mr. Levy recommends that he be sentenced to Probation for three years with the special condition that the first six months be spent in a halfway house and the second six months on home detention, that he work to make full restitution and that he continue with psychotherapy. His request for a variance is based on his lack of any prior criminal history and his likelihood of success on supervision; his remorse and shame for causing the loss to Pay Pal, American Express and "RG" (Levy's customer).; his mental state during the entire 22-month period of the offense---Levy's behavior during the offense is completely out of character to the way he has lived his life for the 59 years before the onset of this fraudulent conduct.

Mr. Levy pled guilty on April 20, 2012, to a two-count Information that charges Credit Card Fraud in violation of Title 18 U.S.C.§1029(a)(5), and False Statements and

1

Records in violation of Title 18 U.S.C. §1001.  He is abject and remorseful.  The family home is currently for sale so that the proceeds can be used to make full restitution as soon as possible.

Following the plea on April 20th, Levy was released on unsecured bond, with Pretrial Conditions.  He has complied with all conditions of his release.

Levy understands that in deciding on a sentence the court must consider the advisory guidelines.   In addition, the First Circuit has indicated that a sentencing judge should consider other factors that might make a sentence outside of the guideline range appropriate.  Those factors are enumerated at 18 U.S.C. § 3553(a).  *U.S. v Jiminez-Beltre,* 440 F.3d 514, 518-19 (1stCir.2006)(en banc).  Levy believes the advisory guidelines in this case should be given minimal weight in determining the sentence that this court imposes.  Instead, the application of the § 3553(a) factors warrant a variance from the guidelines based on the mitigating factors discussed below.

## II.     The Advisory Guidelines Unresolved Issues

The Presentence Report calculates Levy's guideline offense level at 19, CHC I, with a sentencing range of 30 to 37 months.  As outlined in his objections to the Report, Levy contends his guideline offense level is 17, CHC I, for a sentencing range of 24 – 30 months.

There is only one issue in dispute--- the two-level increase for Obstruction of Justice.  Levy submits that although he was charged with false statements and records, the two-level increase does not apply in his case.  In addition to the objections already filed, Levy adds that his false statements and submission of false records are part of the

instant offense covered under the fraud. Levy's denials to government investigators were a continuation of the fraud and did not materially impede the government's case, prolong the pendency of the charges, or enable Levy to continue to fraudulently enrich himself.

Rather, the case proceeded without delay; it was barely a year from the end of the offense to the day Levy pleaded guilty---May 5, 2011 to April 12, 2012. See *U.S. v Morales-Sanchez,* 609 F.3d 637(5th Cir.2010); *U.S. v Ahmed*, 324 F.3d 368 (5th Cir. 2003); *U.S. v Scott,* 405 F.3d 615 (7th Cir.2005); *U.S. v Carroll,* 346 F.3d 744(7th Cir 2003). To be sure, Levy's "obstructive" behavior was so transparent that it could not have impeded the government's case; the government had sufficient evidence to prove its case with documents from Pay Pal, American Express, and RG.

From the onset of the offense until the day Levy signed the plea agreement, he was in a state of high anxiety. Levy's misguided efforts at committing the crime and misleading the government were a function of his mental state at the time and the demons that plagued him. *(See, JD Report, Exhibit 1)* (Exhibits redacted), . He has fully accepted responsibility for all of his actions and made a public apology to his friends and customers, via a letter, to them. In a separate letter, Levy has apologized to RG. *(Levy, Exhibit 2).* Levy requests Your Honor to resolve the guideline issues.

Although district courts were always expected to consider statutory factors at 3553(a), judges generally accepted that those factors were adequately considered by the Sentencing Commission. Even as the 3553(a) factors were often at odds with the then mandatory guidelines, appellate courts for the most part considered the supremacy of the guidelines over other factors. Much has changed in the emphasis that guidelines are now afforded. Given the Supreme Court's mandate that in addition to the final advisory

guideline calculation, the sentencing court must consider the statutory sentencing factors at 18 U.S.C. §3553(a), *United States v Booker,* 125 S.Ct. 738 (2005), Levy asks Your Honor to consider that even 24 months incarceration is greater than necessary to punish him for his unlawful conduct.

**III.    Nature and Circumstances of the Offense**

The government's recitation of the fraud fairly presents the facts of the offenses charged. For 36 years, Harry Levy has owned and operated a retail store and warehouse that sells magic tricks and related paraphernalia through the mail, online, and to walk-in customers. In contrast to 37 years in business, the fraud conduct in this case spanned a period of 22 months. The business, known as Hank Lee's Magic Factory, charged the American Express card of RG, a customer, using Pay Pal (Lee's credit card processor), for merchandise the customer never ordered nor received. Although the total amount charged to the credit card was $561,927, American Express and Pay Pal's current loss is $431,127 (the reduced amount reflecting charge-backs to Lee's account). In addition, RG reports out of pocket expenses for lawyers and investigators of $12,212.75 related to Levy's fraudulent use of RG's credit card. Although Levy has been in the magic business for many years, he had never before misused any customer's financial or personal information. Indeed, Levy had a well deserved reputation as an honest business-man. One such long-time customer, JG (redacted), writes:

> I have known Harry Levy for over 40 years, as a friend, a customer, and as a business partner. I have known him as an honest, compassionate and caring individual…He always approached his business in an ethical manner. When we were partners in a magic manufacturing business I suggested we make a trick that had been around for

over a hundred years and was no longer available.  We decided to make it more modern looking and proceeded to have several hundred made.  Soon after its introduction Harry received a letter from a magician on the west coast that he had previously manufactured this item and we were stealing it.  Hank was truly overwrought that the magic community would think that he had stolen an idea from someone and, even though we had inventory, he decided to withdraw the item.  *(JG, Exhibit 3).*

In another letter, S K (redacted), writes of Harry Levy as an employer:

(redacted),  My experience with Harry over those years can only be described as exceptionally positive!  He has taught me, through his example, how to run a business with intelligence, honesty and integrity…Closer to home, Harry has also been extremely good to me and my family.  He has made sure that we have had the best of health care, and never asked for a contribution from my paycheck.  This is just about unheard of in small business, but was never a question with him.  Loans were offered, interest free, when this young man (at the time), with a growing family, found himself in financial binds.  The "good" that Harry has provided me and my family over thirty years is immeasurable.  I find it important for you to understand.  *(SK, Exhibit 4).*


Unusual circumstances convened prior and during the offense period that made Levy vulnerable to committing the instant offense.  Although Levy's business started small and eventually expanded to mail order customers and a warehouse to stock inventory, by 2007, the prevalence of the internet and the ease with which potential customers could obtain their magic products from other sellers took a heavy toll on his business.  He closed his retail store in Boston.  At the same time the general economy faltered and the magic business, like many other retail segments, reflected this country's economic downturn.

In addition, in June 2009, Mr. Levy and his company learned they were being sued for $4 million (<u>Roseman, et al. v. Hank Lee's Magic Factory, II, Inc. and Harry Levy, et al.</u>, U.S. Eastern District Court No. 3:09-cv-299, Knoxville, Tennessee).

The suit arose from an incident where a young teenage boy from Tennessee, using his parents' credit card, purchased a pyrrhic magic trick through Hank Lee's website. The product, which Hank Lee's sold as provided by its manufacturer, required the user to mix chemicals in a specific ratio to be ignited by an electrical current in a small bowl-like vessel. Unfortunately, this young customer chose not to follow the product's instructions, poured too much of the chemicals directly into his hands, and ignited the mixture with a flame. The resulting explosion blew off six of his fingers.

Initially, Hank Lee's insurance company claimed the business policy did not cover this incident. The controversy about whether the insurer would cover the loss, on top of the catastrophic loss suffered by the young boy, weighed heavily on Levy, causing loss of sleep and abnormally high anxiety. It was not until July/August 2010 that the insurer agreed to provide coverage for the boy's (plaintiff's) injuries. By then, Levy had already mired himself in the instant offense. Levy related to Dr. JD during an evaluation conducted in aid of sentencing the effect the suit had on him:

(REDACTED), *(JD Report, Exhibit 1 at 9)*

As the months passed, and Levy's misconduct went undetected, he continued to charge RG's credit card for items that RG never ordered. (REDACTED),

After the fraud was uncovered, federal investigators first interviewed Levy on September 1, 2011. During that interview, Levy contradicted himself and lied to the investigators. At the end of the interview, investigators served Levy with a subpoena

6

asking for documents. Levy responded by providing false documents. During the next two months, Levy was interviewed three more times by government investigators. He continued to lie and contradicted himself several times.*PSR ¶¶17-45*. Later, Levy retained counsel. Almost immediately thereafter, Levy agreed to plead guilty to an Information and did so five months after his last interview with investigators. (REDACTED), In the public apology to his customers referenced above, Levy sent the following email on April 21, 2012:

> A very special and serious message from Hank Lee.
>
> As many of you are aware, yesterday I made a court appearance to plead guilty to my actions. I did a really bad thing, and there's no turning the clock back. My actions have affected myself, my family, my friends, my business and the magic community which has supported me for the past 37 years. It was stupid and senseless and the worst thing I have ever done in my life. I am publicly apologizing and separated myself from the business I love.
>
> I am aware that apologizing does not fix things. It is only a first step in the healing process. The synopsis of the court proceeding which has appeared online, of course, listed the maximum penalties and fines. God willing these will not come to pass. The federal court system works on a point system which, until now, I was completely unaware of. When the sentencing hearing happens in July, everything will be taken into account. For me it is important that I write this. You have been my customers and friends for a really long time and I needed to let you know where things stand.
>
> Hank Lee

Levy's public confessions to his customers generated approximately eighty unsolicited responses. Some representative responses are attached and are a tribute to Levy's openness and willingness to accept full responsibility. The replies also describe the reputation Levy has established both personally and as a businessman. Only two of

the responses stated that they would no longer conduct business with Hank Lee's because of Levy's conduct. *(Emails, Exhibit 5)* (redacted),.

Levy is anxious to make amends, including prompt payment of full restitution. Towards that end, the Levys' family home in Lexington is listed for sale and their seasonal home is now being rented. It is anticipated that the proceeds from the sale will enable Levy to make full restitution within a matter of months.

### IV.     History and Characteristics of Harry Levy

####   a.          Childhood

Harry Philip Levy, presently 61 years old, was raised in Revere, MA, the older of two sons. The father and his brother-in-law owned a gas station that adequately supported the family until the business failed and they declared bankruptcy. (redacted), While the father never recovered as a business man, he became employed as a postal clerk (for what is now the United States Postal Service) and again provided for his family.

(REDACTED), The Levy family was raised in an observant Jewish home where their religious faith and traditions were emphasized. Levy's mother wanted her sons to be faithful to their religious upbringing. (REDACTED),

####   b.          Hank Lee's Magic Factory

Levy did well in school and graduated from Tufts University with a degree in Electrical Engineering (1972). Three years later, Levy opened Hank Lee's Magic Factory, a culmination of his life-long fascination with magic. The business did well and eventually, Levy opened a retail store in Boston, maintained a warehouse in Medford and employed eight people. (redacted),   But the good times did not last, as the proliferation

of the internet cut into his business and the downturn in the economy took its toll. Levy closed the retail store in Boston and moved his retail business to the Medford warehouse. Reluctantly, he pared down to the two employees who presently work for him. The scaled down business received a further blow in 2009 with the injury to the young Tennessee customer and the filing of the $4 million personal injury lawsuit discussed above. Although the suit was settled after a year, neither Levy, nor the business, ever recovered.

    c.    **Marriage & Family**

Levy married when he was nearly 34 years old. His wife, Bonnie nee Miller, was 33. Bonnie was also raised in Revere. (redacted),

The Levys waited a few years before beginning a family. (REDACTED),

Aron Levy writes (redacted), My dad is a man who has proven to me that it is possible to turn one's true passion in a successful and lifelong career." *(Aron Levy, Exhibit 7).* (REDACTED),

    Levy's younger son writes a poignant letter describing how his father encouraged him to follow his dream of becoming an opera singer. With support of his father, he chose to attend a music conservatory after he graduated from high school: (redacted), *(Lucas Levy, Exhibit 8).*

    (REDACTED)

**V.**    **Meeting the Purposes of this Sentence**

    Seven years after the Supreme Court decided that guidelines were no longer

mandatory, it has become ingrained in the federal courts that, in addition to considering guidelines, the overarching directive is the need to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. These purposes include the need to reflect on the seriousness of the offense, promote respect for the law, provide just punishment, create adequate deterrence, protect the public from future crimes of the defendant, and provide the defendant with necessary treatment and training. 18 U.S.C. §3553(a).

Mr. Levy avers that a sentence of three years Probation with the first six months in a halfway house followed by six months on home detention sufficiently reflects the seriousness of his behavior. Although the variance requested by Levy is less than the calculated guidelines, Levy submits that the guideline range, based largely on the fraud loss table (base offense level increased by 14), does not account for mitigating factors that support the imposition of a lesser period of incarceration. The Commission's longstanding and ever-increasing loss table as a proxy for culpability remains seriously flawed. From the beginning, the Commission chose a guideline system that would ensure that fraud defendants would face harsher penalties than prior to guidelines. The loss table went from adding 11 levels to a defendant's offense level in 1988 to a maximum of 30 levels today. In many cases, loss "is a kind of accident" and thus "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v Emmenegger,* 329 F. Supp.2d 416 (S.D.N.Y.2004). Numerous courts recognize this flaw with the loss table. *See, e.g., United States v. Mueffelman,* 400 F.Supp. 2d 368,372(D.Mass.2005) (same), *aff'd,* 470 F.3d 33 (1st Cir.2006); *United States v. Watt,* 707 F.Supp.2d 149,155(D.Mass.2010) (sometimes loss

is an effective "proxy for evaluating culpability," "sometimes it is not"); *United States v Faulkenberry,* 759 F. Supp. 2d 915, 928 (S.D. Ohio 2010) ("As has become common among district courts sentencing white-collar offenders in financial fraud cases, the Court finds that the loss calculation substantially overstates the gravity of the offenses here and declines to impose a within-Guidelines sentence.), aff'd__*Fed.Appx.*__(6th Cir.Feb.15, 2012).

A careful examination of the sentencing data for sentences imposed under §2B1.1 show the guideline does a poor job of capturing offense seriousness or offender culpability. Only 55% of fraud sentences were within the range in FY 2011.[1] The 54.6% rate of below-range sentences imposed for fraud (as opposed to larceny and embezzlement, 73.6% and 63.9% respectively) is striking. Notwithstanding those below-range sentences, 78.8% of fraud offenders received sentences of imprisonment.[2] The Median sentence in months for fraud offenders was 12 months, the Mean sentence was 23 months.[3]

While other factors may influence the dramatic decline in the rates of within guideline sentences, the data suggest that the loss table bears no meaningful connection to offense seriousness or offender culpability. Judges, as well as prosecutors, are finding that in many cases, §2B1.1, especially for fraud, produces sentences that are too severe.

In a recent First Circuit fraud case, the appellate court affirmed probationary sentences for two defendants, after a jury convicted them. The court varied from the

---

[1] USSC, *Final Quarterly Data Report: Fiscal Year 2011 Data,* Table 3 (2011) *(Table 3, Exhibit 9).*

[2] U.S. Sentencing Commission, 2011 Datafile, USSCFY11, Table 12 *(Table 12, Exhibit 10).*

[3] U.S. Sentencing Commission, 2011 Datafile, USSCFY11, Table 13, *(Table 13, Exhibit 11).*

guideline range, as the government points out, by 100%, i.e., from 87-108 months to Probation. *U.S.v Prosperi*, slip op No.10-1739P (1st Circuit, July 13, 2012). Among other issues, the district court pointed out that the loss table increased the guideline by 18 levels. Without the increase in loss, the guideline range would be 8-14 months. *Slip at 16.* In Levy's case, without the 14 level loss increase, the guideline range would be level 6, guideline range 0-6 months. The appellate court upheld the variance because the judge provided other 3553(a) reasons in addition to its disdain for the loss table, i.e., family circumstances, lack of recidivism, lack of personal gain.

### VI. Levy's Personal Culpability

In *Graham v Florida,* U.S. slip op No 08-7412 (May 19, 2010); 78 U.S.L.W. 4387, the Supreme Court decided that life without parole for juveniles in non-homicide cases is unconstitutional. In constructing its decision, the Court considered the purposes of sentencing that apply to all sentences. With regard to retribution, the Court cited approvingly, *Tison,* 481 U.S., at 149, for the proposition that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Graham slip op at 20.* Harry Levy asks this Court to consider his personal culpability in light of his otherwise law-abiding life, his mental and emotional state during the 22 months of the fraud, his palpable shame for participating in the fraud, and his motivation to keep the business going and avoid bankruptcy. See *U. S. v Ranum,* 353 F. Supp.2d 984, (E.D.Wis., 2005) (below guideline sentence warranted for bank officer convicted of defrauding bank, in part because defendant did not act for personal gain or for improper personal gain of another. "Under §3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive.") *Wisconsin v*

*Mitchell,* 508 U.S. 476,485(1993) ("the defendant's motive for committing the offense is one important factor"); also *U.S. v Rothberg,* 222 F. Supp. 2d 1009(N.D.Ill 2002) (Downward departure proper where defendant, in copyright infringement case, did not act out of a desire to profit or benefit financially thus removing the case from heartland of the guideline). Undeniably, Levy's offense cost American Express and Pay Pal $431,127.72. It is also true that Levy understood he was committing fraud when he charged RG's credit card for merchandise RG never ordered. Even so, the motivation for his offense was not greed; rather Levy used the money to keep his business going and to pay salaries. More to the point, Levy did not profit from the offense; to the contrary, he must sell his house in order to pay the restitution in full. His remaining two employees will lose their jobs in the event Levy is required to close his business. Under analogous circumstances, in *Prosperi* the court upheld the district court's imposition of a below guideline sentence of probation commenting that "There is no evidence that the defendant intended to enrich himself personally or intended to harm the [Big Dig] project or taxpaying public in any specific sense." *Prosperi slip at 2.*

### VII.    Levy's Conduct was Totally Out Of Character

The Sentencing Reform Act, 28 U.S.C. §994(j) directed the Sentencing Commission to consider probation for first offenders not convicted of serious offenses. It ordered the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…"*Id.*

What followed from the Sentencing Commission were limitations on what is to be

considered aberrant behavior. U.S.S.G §5K2.20. A series of amendments continued to further restrict the application of this departure, even a fraud scheme.[4] *Id comment (n.2).* Since *Booker* and *Rita*, these restrictions are advisory only. District courts have discretion to consider the individual circumstances of the defendant as part of their analysis under §3553(a) and under *Kimbrough* and *Spears,* to reject the guidelines on policy grounds.

Levy encourages the Court to consider his life as a hard working, taxpaying member of the community, thoughtful caregiver of his family and employees who has lived in the community for 59 years with a spotless record prior to the instant offense. Family and friends have written letters attesting to Levy's good character and the caring love he has given to all. R W grew up with Harry in the same neighborhood and attended the same schools as Harry. RW got to know Harry even better after Harry married his first cousin. RW writes:

> He has two great loves. His family, and the business he started after graduating college. I have watched him extend help to many a friend and relative by hiring them when work was not available anywhere else, even if he didn't need them. He has offered financial help on several occasions to family members without ever having been asked. He became a safety net for many people both for his generosity and clear headed advice given to anyone who asked. His dedication to providing a loving, safe and sound environment for his two sons and wife presented a clear picture and example of how to provide stability and self sacrifice for the love of a family. . *(R W, Exhibit 12).*

Additional testimony of Harry's kindness and caring comes from M &J R. M has known him for 25 years. M writes:

---

[4] Fraud was excluded as a possible Aberrant Behavior departure because some Commissioners believed every fraud defendant would attempt to employ the departure. This conclusion failed to consider the various types of fraud and the specific offender characteristics that might be factors worthy of a departure. This policy was not based on any empirical research.

14

(redacted), In October 2007, he was born, our son had severe respiratory problems that required him to be in the intensive care unit at the Brigham & Women's hospital for three weeks.  One of the things that I will always remember is that when my wife and I were going through this difficult period, Harry was there supporting us (coming to hospital, checking up on our son, being there for us in every way).  He has always been compassionate, caring and thoughtful.  Also, I always felt that Harry developed a strong bond with our son.  As he grew up, whenever our family came together, Harry would pick him up, play with him, and get him to laugh (which he still does to this day).  I distinctly remember on numerous occasions when our families would get together, our son would always run to Harry so he could be scooped up in his arms….When I first heard about Harry and the charges against him, I was extremely shocked (and still am to this day).  From my perspective, what Harry did was 100% completely out of his character and does not represent the person that I have known for over 25 years.  There are no words that I could say, nor sentences that I could write which could convey how I feel about Harry, not only as a member of my family, but as a human being...  *(M, Exhibit 20).*

## VIII.   Levy suffered from Diminished Capacity

After conducting an intensive evaluation of Harry Levy's life and emotional background and present state, Dr. JD concludes that Levy has lived a decent, trustworthy, and honorable life prior to the instant offense.

(REDACTED)

*(JD report, Exhibit 1 at 14).*

## IX.   Deterrence

One of the goals of a 3553 sentence is deterring Mr. Levy from future crimes as well as generally deterring others who might try to defraud others in a similar scheme. Anyone seeking to defraud a credit card company should realize the folly of such a venture. Credit card companies are alert to such schemes and there is very little chance of remaining undetected. Some punishment, such as suggested by Levy, might deter others, but a bigger factor is the requirement to pay restitution. "The period of home confinement, community service, and fine are punitive measure that serve as deterrents, promote respect for the law, and are just punishment given all of the circumstances present in this case." *Id Prosperi at 21*.

In the end, the only real concern here is specific deterrence- is Levy likely to re-offend? Undoubtedly, he will not. In Levy's case, he not only faces paying in excess of $400,000 additional restitution, he also faces the uncertainty of providing continued support for his family, including the uncertain future of his disabled son. Levy's ability to maintain his business will be jeopardized by any period of incarceration. He has already removed himself from the business' financial transactions. Given the unique circumstances that existed when Levy's criminal activity occurred, there is no reason to believe that Levy would ever again engage in unlawful conduct.

It has been generally accepted that repeat offenders are at greater risk to recidivate and hence have greater culpability than first offenders.[5] The Sentencing Commission has conducted research that examined predictive power using various measures of recidivism, and the extent of the crime control benefits derived from increasing sentences

---

[5] *See* <u>Supplementary Report on the Initial Sentencing Guidelines and Policy Statements,</u> United States Sentencing Commission, June 18, 1987, pg 41

in relation to the criminal history score.[6]  In its first study "Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines," May 2004, the Commission concluded that "There is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar." *At p.* 15.  As for controlling crime, it would seem that if the recidivism rates are the same no matter how long the sentence, the only benefit of the long sentence is warehousing people longer to keep them off the street.  This is a benefit when dealing with truly violent offenders.  Obviously, Levy is not a violent offender and the likelihood of his committing another crime is minimal.

Other findings that predict recidivism show that rates decline relatively consistently as age increases, from 35.5% under age 21, to 9.5% over age 50;  lower recidivism follows if there is a stable employment in the recent past; recidivism rates are lower for defendants who are or were ever married; rates are lower for those without illicit drug use in the year prior to the offense; also offenders sentenced under the fraud, larceny and drug guidelines, i.e., non-violent offenses, like Levy, are least likely to recidivate.

The Supreme Court recognized a problem in sentencing defendants without due consideration of individual circumstances and held that incarcerating defendants without regard to the specific characteristics involved in the defendant and offense could well promote disrespect for the law.  Justice Stevens quoted the District Judge's conclusion in *Gall* that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.  In *Gall* as

---

[6] Id.

here, a harsh sentence would do nothing to promote respect for the law.  On the other hand, a sentence that does not include further incarceration would promote a sense of an appropriate punishment and hence respect for the law." *Gall v United States,* 552 U.S. 38 (2007).

Harry Levy is profoundly sobered by the prosecution of his offense.  Ashamed and remorseful, he is making an effort to pay restitution as soon as possible.  This is in contrast to defendant Prosperi who went to trial.  The government lamented "[e]ven in Mr. Prosperi's sentencing memorandum I sense no admission of wrongdoing.  I sense no remorse…"*Prosperi slip at 17(n.8).* The government should concede that Levy deserves some consideration for his early plea to an Information, public apology, and efforts to make amends.

### X.     Conclusion

Among those who know him best, including his friends, colleagues, and family, the overwhelming sentiment is that the last place they expected to find Harry Levy was standing before a United States District Judge awaiting sentencing for crimes involving substantial fraud and false statements.  Nonetheless, for the reasons detailed above and in the JD Report, Mr. Levy committed the self-destructive and serious acts charged in the Information.

Mr. Levy respectfully submits that the appropriate disposition in this case is a downward variance from the advisory range set by the guidelines. Counsel recommends

that this Court impose a sentence of Probation with conditions of community confinement and home detention as an alternative to imprisonment. The requested sentence will reinforce to Mr. Levy the seriousness of his crime, something of which he is already well aware. Additionally, the requested sentence will permit Levy to continue to operate Hank Lee's or arrange for its sale or orderly closure as circumstances dictate, to receive much needed treatment as outlined by JD, and to assist in the care (redacted),

Counsel submits that the requested sentence satisfies the requirements of 18 U.S.C. §3553(a) in that: it reflects the seriousness of the offense, deters future criminal conduct, protects the public, and adequately takes into account the specific offender characteristics present in this case.

        Respectfully submitted
        HARRY P. LEVY
        By his attorney,

        /s/ Steven A. Sussman

        Steven A. Sussman
        B.B.O. #488800
        6 Beacon Street Suite 400
        617-973-4800
        Boston MA 02108

Dated:      September 3, 2012

## Certificate of Service

I hereby certify that this document(s) filed through the EFT system/or under seal will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 3, 2012

        /s/ Steven A. Sussman